# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA  :  **CRIMINAL COMPLAINT**

      v.  :

                                     :  Mag No. 11-6108

GREGORY TAYLOR aka "Ronnie"

I, the undersigned complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief.

SEE ATTACHMENT A

I further state that I am a Special Agent, and that this complaint is based on the following facts:

SEE ATTACHMENT B

continued on the attached page and made a part hereof.

_____
Denise A. Gerardi, Special Agent
U. S. Department of Labor
Office of Inspector General
Office of Labor Racketeering &
Fraud Investigations

Sworn to before me and subscribed in my presence,
September 13, 2011, at Newark, New Jersey

Honorable                              _____
United States Magistrate Judge         Signature of Judicial Officer

## ATTACHMENT A

From in or around October 2006, through in or about May 2010, GREGORY TAYLOR, aka "Ronnie" did knowingly and wilfully embezzle, steal and unlawfully convert to his own use, and the use of others, money and funds of Local 1233, a labor organization of which he was the Secretary Treasurer, by causing the union to improperly disburse funds to him through his use of unauthorized payroll checks, debit cards, credit cards and other expenditures, totaling in excess of $100,000, contrary to Title 29, United States Code, Section 501(c).

ATTACHMENT B

I am a Special Agent (hereinafter "Your Affiant") with the Department of Labor, Office of Inspector General (DOL-OIG), and I am assigned to the Special Agent in Charge in New York, NY. My office is located in Springfield, New Jersey. I have been a Special Agent with the DOL-OIG since February 1999. My duties and responsibilities include, among others, the investigation of criminal violations relating to labor organizations, as well as the investigation of fraud, waste and abuse within the Department of Labor, and the programs it administers.

### Introduction

At all times relevant to this complaint:

1. Local 1233 of the International Longshoreman Association (hereinafter "Local 1233"), headquartered in Newark, New Jersey, is a "labor organization" as that term is defined in Title 29, United States Code, Sections 152(5), 402(i) and 402(j). It represented, sought to represent, and would have admitted to membership individuals who worked on the ports of New Jersey and New York.

2. Defendant Gregory Taylor, aka "Ronnie", (hereinafter "Taylor") was the Secretary Treasurer of Local 1233 of the International Longshoremen's Union, in Newark, N.J. from in or about January 2005 to in or about May 20, 2010. As Secretary Treasurer, Taylor had a fiduciary duty to manage the assets of the union with care, skill and prudence and to ensure that the union's expenditures were for the benefit of the union and its members.

3. According to the Constitution and By-Laws of Local 1233, the duties of Secretary Treasurer include: (1) receiving all monies paid to the union and depositing them into a union bank account; (2) co-signing all checks from the union; (3) keeping true and accurate records of all of the union's financial transactions; (4) receiving authorization from the Executive Board in order to disburse union funds; and (5) reporting all financial transactions to the union's Auditing Committee.

4. During the course of my investigation of Local 1233, your Affiant has reviewed records subpoenaed by a Federal grand jury and conducted interviews of numerous individuals, including among others, Local 1233 Executive Board members, as well as vendors, service providers and other individuals having had business with Local 1233.

**Unauthorized Payroll to Gregory Taylor**

5. Local 1233 retained ADP to administer the payroll for its employees. Each week, ADP calculated the gross payroll for each union employee and then generated the requisite payroll checks that were mailed to the union. The payroll was funded by the union's operating account at Bank of America. Based upon your Affiant's investigation, I have determined that Mr. Taylor's gross weekly salary was $2,854. According to the ADP Pay Schedule for 2007, there were 53 pay weeks for the year; which meant that 53 pay checks would be issued to each union employee. The union's accounting firm authorized the issuance of the weekly payroll. However, I have also determined that, as Secretary Treasurer at Local 1233, Mr. Taylor was in the position to independently seek additional paychecks from ADP.

Based on my review of the 2007 ADP records, the Executive Board minutes and the union's operating account, Mr. Taylor received and cashed a total of 55 pay checks; resulting in two extra pay checks being cashed that were not authorized by the Executive Board of Local 1233. These extra paychecks provided no apparent benefit to the union or its members, and resulted in a total of $5,708 in unauthorized and improper salary to Mr. Taylor.

6. The ADP Pay Schedule for the year 2008 reported that 52 pay checks would be issued to each union employee. Based on my review of the 2008 ADP records, the Local 1233 Executive Board minutes and the union's operating account, Mr. Taylor received a total of 58 pay checks, resulting in six extra pay checks given to him that were not authorized by the Executive Board of Local 1233; and therefore, provided no apparent benefit to the union or its members. The six extra payroll checks resulted in a total of $17,124 in unauthorized salary to Mr. Taylor.

7. The ADP Schedule for the year 2009 shows that 52 pay checks would be issued to each union employee. Based on my review of the 2009 ADP records, the Local 1233 Executive Board minutes and the union's operating account, Taylor received a total of 65 pay checks, resulting in 13 extra pay checks received by him that were not authorized by the Executive Board; and therefore provided no apparent benefit to the union or its members. The fourteen extra payroll checks resulted in a total of $39,956 in unauthorized salary to Mr. Taylor.

8. In total, between 2007 and 2009, Mr. Taylor received approximately $62,700 in unauthorized salary from the Local 1233 Operating Account.

**Unauthorized use of petty cash payments**

9. Your Affiant determined that from in or about February 2007 through in or about February 2010, Taylor cashed 44 "petty cash" checks from the union's operating account at Bank of America. With the exception of two checks (one for $50 and one for $1000), these checks were each made payable for exactly $300. Based upon your Affiant's review of the union's records, Executive Board minutes and interviews with Ex-Board members, there is no evidence to support the purpose (either for supplies or petty expenses) for which these petty cash checks were routinely issued. $300 each month is clearly an inflated amount. Indeed, records show that other union officers regularly used the union's debit card and the Local 1233 Staples credit card for routine office supplies and the incidental expenses that arise during the normal course of the union's operation. Furthermore, during the time periods reflected above, Taylor's own use of the union's offices was sporadic, and consequently his need for supplies, beyond those already purchased by other Executive Board members, would seem to be extremely limited. Finally, these petty cash checks were not authorized by any Executive Board action, nor co-signed as required by the union's by-laws; accordingly a $300 monthly disbursement would provide no apparent benefit to the union or its members.

10. The 44 petty cash checks resulted in a total of $13,650 in unauthorized and improper disbursements of union funds to Mr. Taylor.

**Unauthorized Use of the Union's Debit Card and Credit Card**

11. From in or about January 2007 to in or about November 2009, Taylor used two union debit cards that were linked to the Local 1233 operating account at Bank of America. Taylor was supposed to use these debit cards for union related expenditures. Instead, Taylor used the debit cards for various unrelated personal expenses, including among other things, travel, restaurants, airport fees and car rentals. These purchases were not authorized nor approved by the Executive Board and provided no apparent benefit to the union or to its members. The total debit card expenditures resulted in excess of $20,000 in unauthorized and improper disbursements of union funds to Mr. Taylor.

12. From November 20, 2009 and May 2010, Taylor used a union debit card to purchase round-trip airline tickets from both Delta and United Airlines, totaling $1,138.90. The tickets were issued for Taylor's personal travel to Colombia from on or about November 27, 2009 through on or about December 1, 2009. These

travel expenditures were not authorized by the Executive Board, nor provided any apparent benefit to the union or its members.

13. In or about November 2009, Taylor improperly obtained an American Express credit card in the name of the union. The card was used to purchase round-trip airline tickets totaling $1,460 for personal travel from New Jersey to Abidjan (a city along the Ivory Coast of Africa) from on or about January 19, 2010 to on or about February 2, 2010. He also made several changes to his Abidjan travel itinerary, which resulted in additional airline charges of $1,614. The total expenditures resulted in $3,505 in unauthorized and improper disbursements of union funds to Mr. Taylor.

**Wakefern Gift Cards**

14. On or about November 7, 2008, Taylor purchased 1,000 gift cards from Wakefern Food Corporation ("Wakefern") with a Local 1233 check (#608) for $19,000. Each gift card was worth $20. [Wakefern discounted bulk purchases]. Wakefern is the parent organization of Shop Rite supermarkets. Historically, the union purchased the gift cards (aka "turkey coupons") for distribution to the union members during the Thanksgiving\Christmas holiday. The gift cards were redeemable at Shop Rite stores.

15. On or about December 8, 2008, Taylor purchased 50 additional gift cards for $1,000 from Wakefern with a Local 1233 check (#632). In total, the union purchased 1,050 gift cards totaling $20,000 purportedly for distribution to the union members for the 2008 Thanksgiving\Christmas holiday.

16. A review of Wakefern's records shows that, between November 2008 and approximately November 2009, 172 of the 1,050 gift cards purchased by the union were apparently redeemed by Mr. Taylor or V.T. (a related person), using a personal ShopRite Price Plus Card. The 172 gift cards were worth $3,440. The vast majority of these 172 gift cards were redeemed at two Shop Rite stores in the immediate vicinity of the Taylor residence in Edison, NJ.

17. On or about November 16, 2009, Taylor purchased 400 gift cards for approximately $7600 from Wakefern with a Local 1233 check (#8484). The gift cards were worth $20 each and were to be distributed to the union members for the 2009 Thanksgiving\Christmas holiday. A review of Wakefern's records shows that, from November 2009 to December 2009, 135 of those 400 gift cards were redeemed by Taylor and V.T., using a personal Shop Rite Price Plus Card. As before, the majority of these gift cards

were redeemed at two stores near their residence in Edison, NJ. The 135 gift cards were worth $2,700.

Conclusion

18.  Based upon the above representations, your Affiant believes sufficient facts have been presented to establish that GREGORY "Ronnie" TAYLOR has embezzled in excess of $100,000 from Local 1233 ILA, in violation of Title 29 U.S.C. Section 501(c).